WILLIAM M. NARUS, CAB #243633
Acting United States Attorney
District of Oregon
**LEWIS S. BURKHART, OSB #082781**
Assistant United States Attorney
Lewis.Burkhart@usdoj.gov
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **3:23-cr-00101-SI** |
| **v.** | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| **CIEDRIC ROYCE BROUSSARD,** | |
| **Defendant.** | |

**Introduction**

After two federal convictions, the defendant took ecstasy, became paranoid and threatened AV1 with a firearm. Given the defendant's dangerous behavior, serious criminal history and balancing the mitigation factors, the government recommends a sentence of fifty-seven months imprisonment followed by three years of supervised release.

/ / / /

/ / / /

**Factual Background**

**A. The Offense Conduct**

On the night of February 20, 2023, Tillamook County deputies and Oregon State Police (OSP) troopers responded regarding a disturbance. On arrival, they contacted the reporting party who was standing in the roadway near the residence. The reporting party advised that there was a firearm, which belonged to his daughter ("AV1") inside the home. (PSR ¶ 9).

As officers approached the residence, they heard male and female screaming coming from inside. OSP Trooper Zepeda utilized a body camera and his interactions were recorded. (Exhibits 1-4). They knocked on the door, and AV1's mother opened the door. She then looked back into the home and stated, "Oh. Police were called." Officers observed AV1 retreat into a bathroom, and they saw a male (later identified as the defendant) holding an unknown object (later determined to be AV1's firearm) in his hand. (PSR ¶ 10). See screenshot from the body camera below with a red circle pointing out the firearm in Defendant's right hand. (Exhibit 1).

////

////



Trooper Zepeda introduced himself to the defendant and identified himself as a law enforcement officer. (Exhibit 1). The defendant reached into the bathroom with his right arm, concealing what was in his hand, and responded, "Who?" The trooper again identified himself. (*Id.*). The defendant leaned into the bathroom, with his right arm still concealed, and placed something inside, which was later determined to be the firearm. (*Id.*). His right arm then reemerged, empty. (*Id.*). The trooper repeatedly asked the defendant to exit the residence, and the defendant refused, stating, "You ain't no police, man." (*Id.*). The defendant lunged back into the bathroom, toward AV1 and the screaming and yelling escalated. (*Id.,* PSR ¶ 11).

Trooper Zepeda entered the residence and rounded the corner into the bathroom, where he observed that the defendant had moved behind AV1 and appeared to be using her as a shield.

(Exhibit 1). The trooper pointed his firearm at the defendant and issued multiple verbal commands to get on the ground, which the defendant disregarded. AV1 made numerous attempts to exit the bathroom, but the defendant pulled her back in. According to the defendant, at the time of the offense, he believed that the police were impersonating law enforcement officers and that they intended to cause harm to him and AV1. The defendant indicated that he was attempting to protect AV1 by pulling her into the bathroom. After confirming that both of the defendant's hands were empty, the trooper holstered his firearm, grabbed the defendant's arms, and detained him. (PSR ¶ 12).

AV1's mother was interviewed. (Exhibit 4). AV1's mother reported Defendant pointed the firearm with a laser sight at AV1 several times. (*Id.* at :27). AV1's mother could see the red laser dot on AV1's face. (*Id.*).

Local sheriff deputies and the state troopers attempted to interview AV1 about what occurred several times. (Exhibits 2-3). AV1 reluctantly provided a statement to them. (Exhibit 2 at :06; Exhibit 4 at :55). She reported they both took ecstasy and AV1 became more paranoid. (Exhibit 3 at :05). AV1 acknowledged the defendant was normally paranoid, but the paranoia became worst after using drugs. (*Id.*) Defendant blamed AV1 for people being after him, obtained her firearm, waived the gun around and pointed the firearm at AV1. (Exhibit 2-3). She described being "scared" and "terrified" during the incident. (Exhibit 2 at 1:08; Exhibit 3 at 3:31).

While he was being taken into custody, the defendant continued to yell, asserting that the trooper was not a police officer and telling AV1 to call the police. He was sweating profusely, had dilated pupils, and was breathing rapidly. He complained that his legs and stomach hurt, he

felt dizzy, and his lips were numb. He repeatedly shouted, "Don't kill me!" Officers observed the defendant's behavior to be consistent with someone under the influence of ecstasy (MDMA). The defendant denied taking any drugs. However, he would later admit to using ecstasy. (PSR ¶ 13).

On the defendant's person, officers discovered a fully loaded 31-round Glock magazine, as well as three 10-round Glock magazines, one 17-round Glock magazine, and a five-inch spring-assisted pocketknife. As previously noted, the firearm, as well as the associated magazines, were determined to belong to AV1. (PSR ¶ 14).

One officer remained with the defendant, while others contacted AV1 for follow-up. When interviewed, AV1 told officers that after the defendant set the gun on the bathroom counter, she moved it beneath the sink to conceal it from him. With AV1's consent, officers looked underneath the bathroom sink and discovered a 9mm Glock 26 pistol, mounted with a TLR-6 laser, and with a fully loaded 31-round magazine inserted. In total, from inside the firearm and on the defendant's person, officers seized 108 rounds of live ammunition from the residence. (PSR ¶ 15).



Due to his erratic behavior, the defendant was transported to the hospital, where several nurses attempted to evaluate him. However, he remained frightened and combative, looking around frantically and repeatedly yelling that the nurses were going to kill him. For the safety of hospital staff, an evaluation was not completed. (PSR ¶ 19).

A record check revealed that the defendant was a convicted felon. The defendant was taken to the Tillamook County Jail, where he was lodged on state charges of Menacing – Domestic, Assault IV – Domestic, Coercion, Unlawful Use of a Weapon, and Possession of Weapons by Certain Felons. (Exhibit 7). He was released from custody the following day. (PSR ¶ 20).

A Tillamook County Sheriff's deputy, tried to follow up with AV1 two days later. (Exhibit 5, p. 2). AV1 would not allow the deputy on to her property, would not allow him to take follow up photographs and was generally uncooperative. (*Id.,* at p.3). Due to AV1's actions, Tillamook County District Attorney's Office was unable to move forward with domestic violence charges.

On April 4, 2023, a federal grand jury returned an indictment charging the defendant with the instant offense, and an arrest warrant was issued. On April 6, 2023, the Tillamook County District's Attorney's Office declined to file charges for the instant offense conduct, as the case was being prosecuted federally, and the victim declined to cooperate. (PSR ¶ 22).

**B. The Charges**

On December 4, 2024, Defendant pled guilty to the two count Indictment: Count 1 which charges Felon in Possession of a Firearm, in violation of Title 18, United States Code Sections 922(g)(1) and Count 2 which charges Felon in Possession of Ammunition, in violation of Title

18, United States Code Sections 922(g)(1). Defendant pled guilty without a plea agreement and there is no agreement between the parties.

**C. Guidelines Computation**

Defendant's conviction for a controlled substance offense and possession of a firearm capable of accepting a large capacity magazine raise the base offense level. The government agrees with the PSR calculation of the base offense level of 22 due to the conviction and large capacity magazine. USSG § 2K2.1(c)(5). (PSR ¶ 29). Defendant has shown acceptance of responsibility, so a three-level reduction applies, provided he continues to demonstrate acceptance of responsibility. USSG §3E1.1(a),(b) (PSR ¶ 36 – 37).

1. <u>Possession of a Firearm During the Commission of Another Felony offense</u>

The United States joins the PSR seeking a four-level increase to the guidelines under USSG 2K2.1(b)(6)(B) for using or possessing the firearm during the commission of another felony offense. (PSR ¶ 30). The four-level enhancement applies to any federal, state or local felony, "*whether a criminal charge was brought, or a conviction obtained*." USSG 2K2.1 cmt. n.14(C) (*Emphasis* added); *United States v. Parlor*, 2 F.4th 807, 814-815 (9th Cir. 2021); *United States v. Jimison*, 493 F.3d 1148, 1149 (9th Cir. 2007), *citing United States v. Dodge*, 61 F.3d 142, 146 (2d Cir. 1995).

The Ninth Circuit has hewn closely to the commentary's broad reading, upholding the enhancement where the government proves by a preponderance of evidence that the firearm "had some potential" to "embolden[ ]" the defendant to commit a felony. *United States v. Routon*, 25 F.3d 815, 819 (9th Cir.1994).[1] If the government shows, "that the firearm was possessed in a

[1] As a general rule, the standard for the Court to find the enhancement is by a preponderance of the evidence. *United States v. Valle*, 940 F.3d 473 (9th Cir. 2019). A standard of clear and convincing evidence applies where there is "an

manner that permits an inference that it facilitated or potentially facilitated" the felonious conduct, the enhancement applies. *Id*.

As detailed in the factual summary, Defendant took ecstasy and became paranoid people were after him. (PSR ¶ 16). He blamed AV1 for the individuals coming after him. (PSR ¶ 17). He retrieved AV1's firearm, which contained a laser sight. (*Id.*). While threatening AV1, Defendant pointed the gun at the victim with the red laser dot appearing on her face. (PSR ¶ 17, Exhibit 4). At one point, Defendant said, "If I am going to die, I'm taking you with me." (*Id.*). AV1 reported she was "scared" and "terrified." (Exhibits 2-3).

Local law enforcement arrested[2] Defendant for two misdemeanor domestic violence crimes, and three felonies: Coercion (ORS § 163.275), Unlawful Use of a Weapon (ORS § 166.220) and Felon in Possession of a Firearm (ORS § 166.270). (Exhibit 1, 5, 6). Both the charge of Coercion and Unlawful Use of a Weapon are Class C Felonies and punishable by more than 12 months imprisonment.

Coercion occurs when a person compels or induces another person to engage in conduct from which the other person has a legal right to abstain by means of instilling in the other person a fear that, if the person refrains, the actor will unlawfully cause physical injury to some person, among other potential listed acts. ORS § 163.275. Unlawful Use of a Weapon occurs when a person attempts to use unlawfully, or carries or possesses with intent to use unlawfully against another, any dangerous or deadly weapon as defined by statute. ORS § 166.220.

---

extremely disproportionate impact on the sentence." *United States v. Jordan*, 256 F.3d 922, 940 (9th Cir. 2001). The enhancements do not rise to the level to bring in the higher standard, nor is the Defendant requesting the Court to do so.

[2] The U.S. Attorney's Office (USAO) adopted this case for federal prosecution of the felon-in-possession charge. The Tillamook County District Attorney's Office did not file state charges on the other offenses because the victim refused to cooperate. PSR ¶¶ 21-22; Exhibit 5, p. 2-3.

Under the facts of the offense—where defendant pointed a gun at his girlfriend and threatened death—those two felonies would also include the firearm enhancement pursuant to ORS 161.610, which carries a five-year mandatory minimum sentence. *See State v. Hawkins*, 261 Or. App. 440, 450-51 (2014) (enhancement applies when a defendant personally used or threatened to use a firearm); *State v. Harris*, 174 Or. App. 105, 113 (2001) ("use or threatened use" means discharge or threatened discharge). *State v. Pies*, 104 Or. App. 646, 651 (1990) (application of the enhancement requires actual use or threatened use).

Defendant may point to *United States v. Valencia-Mendoza*, 912 F.3d 1215, 1224 (9th Cir. 2019) to argue that an Oregon felony offense at issue in a 2K2.1(b)(6)(B) enhancement cannot be merely classified as a felony, but must be one in which a sentencing court would have been able to impose a sentence of more than a year as applied to him. *Valencia-Mendoza* considered whether the defendant's prior conviction qualified as "a conviction for any other felony offense" for purposes of a sentencing enhancement under USSG § 2L1.2(b)(2). But *Valencia-Mendoza* does not require the same result here, and even if it did, an Oregon sentencing court would be able to impose a sentence of more than a year—indeed, it would be required to.

First, the Ninth Circuit has not yet applied *Valencia-Mendoza* to "another felony offense" under 2K2.1(b)(6)(B), which, unlike the guideline at issue there, does not require a prior conviction. *Cf United States v. Williams*, 5 F.4th 973, 976-77 (9th Cir. 2021) (*Valencia-Mendoza's* finding that the upper bounds of Washington's mandatory guideline range dictates whether a Washington conviction is punishable by more than a year imprisonment also applies to determine whether conduct constituting a Washington offense would be punishable by a term of imprisonment exceeding one year for purposes of a Grade B supervised release violation).

Second, this case involves a circumstance that *Valencia-Mendoza* expressly distinguished. *Valencia-Mendoza* assessed whether the defendant's prior conviction was punishable by a prison term exceeding one year when the state "sentencing court was bound by the statutory sentencing range," and that range topped out at six months. *Valencia-Mendoza*, 912 F.3d at 1223. The governing statute provided that "**[u]nless another term of confinement applies**, the court *shall* impose a sentence within the standard sentence range." *Id.* at 1216 (*emphasis* in original) (**bolding** added). That range "can be modified, or rendered inapplicable altogether, but only if the judge . . . makes certain factual findings." *Id.* at 1224. Valencia-Mendoza's judgment established that none of those findings were made. *Id.* Thus, because the state court was required to impose a sentence within the standard sentence range, "the top sentence of the guidelines range," which was less than a year, "*was* the maximum possible statutory punishment." *Id*. at 1223.

In short, *Valencia-Mendoza* held that the district court must consider not only an offense's statutory maximum, but also its specific sentencing factors, when deciding if a crime is punishable by a term of imprisonment exceeding one year. *Id.* at 1224; *see also United States v. Lizarraras-Chacon*, 14 F.4th 961, 965 (9th Cir. 2021) (reading *Valencia-Mendoza* to say that a sentencing court must also consider state sentencing factors).

Unlike in *Valencia-Mendoza*, where the mandatory sentencing guidelines controlled the sentence, sentencing for defendant's state felonies—Coercion or UUW *With a Firearm*—is controlled by "another term of confinement." These offenses are governed in part by the five-year mandatory minimum firearm enhancement under ORS § 161.610(4). "With the limited exception provided in subsection (5), ORS 161.610 *requires* that the court impose a designated

minimum term of imprisonment if the defendant used or threatened to use a firearm during the commission of a felony." *State v. Stelljes*, 84 Or. App. 637, 639–40, 735 P.2d 24, 25 (1987) (emphasis in original). The statute "expresses a legislative judgment that persons who use or threaten to use guns while committing felonies 'should serve a certain amount of time in jail, period.'" *Id*. at 640. The minimum term "*must* be imposed under ORS 161.610" unless the limited exception in subsection (5) applies. *Id.* (emphasis in original); *see also State v. Nunes*, 295 Or. App. 91, 97 (2018).

Here, we have the flip side of *Valencia-Mendoza*: defendant is necessarily subject to a minimum more-than-a-year sentence (a mandatory 5-year term of imprisonment), unless the court deviates from that default. It is possible that a court could use its discretion to impose a lower sentence under subsection (5) of that statute, but that mere possibility does not undermine what the mandatory minimum sentence applicable to his felony offenses already provides: "a realistic look at what a particular defendant actually *could* receive." *Valencia-Mendoza*, 912 F.3d at 1223 (emphasis added). The sentencing factors here—the mandatory minimum—make these state offenses punishable by imprisonment exceeding a term of one year, regardless of what defendant's applicable guideline is.

Defendant may argue that because he was not charged with these felonies, the enhancement does not apply. But the guideline commentary itself says otherwise. USSG § 2K2.1 n. 14(C) (defining "another felony offense" to mean any federal, state or local offense punishable by imprisonment for a term exceeding one year, "regardless of whether a criminal charge was brought, or a conviction obtained").

The commentary's definition makes sense. A prosecuting office may decline to file charges for many reasons, even if they believe a suspect committed a prosecutable crime. For example, domestic violence cases can be extremely difficult to prosecute given the nature of domestic abuse. Experts and researchers estimate anywhere from 65% to 80% of victims of domestic violence recant and/or do not cooperate with the prosecution.[3] Tillamook County experienced this firsthand in this very case, where officer body camera footage captured defendant holding a gun while shielding himself with AV1 and pushing her into the bathroom so aggressively he pulled out a clump of her hair. Contemporaneous interviews with AV1's mother and AV1 established that defendant pointed the gun at AV1 "a couple of times," resulting in a laser dot on AV1's face, and threatened AV1 by telling her if he was going to die, that he would take her with him. Nevertheless, AV1 refused to cooperate during later follow-up investigation. Given AV1's lack of cooperation, the admissibility of the needed evidence would be

---

[3] McKinstry, "An Exercise in Fiction": The Sixth Amendment Confrontation Clause, Forfeiture by Wrongdoing, and Domestic Violence in Davis v. Washington, 30 Harv. J. L. & Gender 531, 531-32 (2007); Percival, The Price of Silence: The Prosecution of Domestic Violence Cases in Light of Crawford v. Washington, 79 S. Cal. L. Rev. 213, 215-16, 235-37 (2005).
It has been estimated, for instance, that about "80% of domestic violence victims refuse to testify or recant their earlier statements to the police about the violent incident for which the defendant is charged." King-Ries, 39 Creighton L. Rev. 441, 458 (2006); see also Percival, supra, at 235 ("Most jurisdictions report that in the overwhelming majority of domestic violence cases, victims recant the testimony that was given to law enforcement immediately following the violent event, and many victims refuse to continue cooperating with the prosecution."). The California Supreme Court cited expert testimony that "[a]bout 80 to 85 percent of victims 'actually recant at some point'" in prosecutions of domestic violence. *People v. Brown*, 94 P.3d 574, 576 (Cal. 2004) (quoting Jeri Darr, program manager of the Antelope Valley Domestic Violence Council); accord Douglas E. Beloof & Joel Shapiro, Let the Truth Be Told: Proposed Hearsay Exceptions to Admit Domestic Violence Victims ' Out of Court Statements as Substantive Evidence, 11 COLUM. J. GENDER & L. 1, 3 (2002) (offering similar anecdotal evidence); Lisa Marie De Sancitis, Bridging the Gap Between the Rules of Evidence and Justice for Victims of Domestic Violence, 8 YALE J.L. & FEMINISM 359, 367 (1996) (discussing the high rate of noncooperation by victims).

questionable at best. However, the same evidentiary rules do not apply at sentencings. (Fed. R. Evid. 1101(d)(3) (evidentiary rules do not apply to "sentencing").)

A preponderance of the evidence establishes that defendant possessed a gun in connection with another felony offense, namely Coercion and UUW With a Firearm, and that the manner of possession permits an inference that it facilitated or potentially facilitated those offenses. The 4-level enhancement under USSG § 2K2.1(b)(6)(B) applies.

2. Pretrial Performance

Defendant was released into the NWRRC with the requirement he enter and complete outpatient substance abuse and mental health treatment. He graduated from VOA, gained employment and obtained a stable living environment. (PSR ¶ 6).

He did have one pretrial release violation when he failed to submit a urinalysis, took medication not prescribed to him and failed to report. Defendant called pretrial services and reported his violations due to a suicide attempt. Defendant was ordered to reengage with his mental health treatment. (PSR ¶¶ 7-8). While this suicide attempt is concerning, the government does acknowledge the defendant's accomplishments on pretrial release.

The United States recommends a two-level reduction under 18 U.S.C. § 3553(a) for the defendant's efforts on pretrial release and with his substance abuse and mental health treatment despite no plea agreement.

| **Count 1: 18 U.S.C. § 922(g)(1) – Felon in Possession of a Firearm/Ammunition** | | |
|---|---|---|
| USSG §2K2.1(c)(5) | Base Offense Level | 22 |
| USSG §2K2.1(b)(6)(B) | Specific Offense Characteristics | +4 |
| USSG §3E1.1(a) and (b) | Acceptance of Responsibility | -3 |
| 18 U.S.C. §3553(a) | | -2 |
| | **Adjusted Offense Level** | 21 |

**D. Criminal History**

| Crime | Conviction Date | Jurisdiction | Sentence |
|---|---|---|---|
| Terroristic Threat (misd) | 12/07/2001 | Harris County Court, Texas | 30 days |
| PCS – Cocaine (felony) | 01/15/2002 | 228th District Court, Houston, Texas | 24 months |
| Poss. w/ Intent to Distribute (felony)<br>Poss. of a Firearm in Furtherance of a Drug Trafficking Crime (felony) | 03/07/2008 | U.S. District Court, Southern District of Texas | 93 months |
| Felon in Poss. of a Firearm (felony) | 03/07/2008 | U.S. District Court, Southern District of Texas | 71 months |
| DUII (misd) [4] | Incident Date: 3/26/2021<br>Conviction Date: 01/22/2024 | Beaverton Municipal Court | 2 days |

The total criminal history score is seven. According to the sentencing table in USSG Chapter 5, Part A, a criminal history score of seven establishes a criminal history category of IV. (PSR ¶ 47).

**E. Government's Recommended Sentence**

The defendant's actions in this case were incredibly dangerous and everyone involved is lucky that this did not turn into a lethal event. The sole cause for this entire situation resolves around the choices the defendant made. He chose to use ecstasy with gambling winnings, despite being a generally paranoid person. When his paranoia began to infiltrate the defendant's

[4] The defendant had various issues with his DUII supervision, including two failure to appears, failure to attend drug and alcohol screening and the victim impact panel. (PSR ¶ 46). He was last arrested on January 23, 2025 and served one day in custody. (*Id.*). None of these violations qualifies as a violation of his federal pretrial supervision.

thoughts, he made the choice to unlawfully arm himself with a firearm, loaded it with a fully loaded extended magazine and grabbed four firearm magazines that were completely loaded. He had one hundred seven rounds on his person and was ready for a shootout. He then made the choice to point the firearm at AV1 and put the laser sight on her face several times. One pull of the trigger would have caused an incredibly tragic ending. Oregon State Police troopers and Tillamook Sheriff's deputies responded knowing the defendant threatened AV1 with a firearm. When AV1's mother opened the door, the officers were faced with an incredibly dangerous situation. With all the factors involved, the officers could have lawfully used deadly force given the circumstances they were faced with. (ORS 161.242). Thankfully, Trooper Zepeda remained calm and resolved the situation peacefully. However, everyone is lucky the defendant did not shoot and kill AV1 while pointing the firearm at her or even when he forced her back into the bathroom in front of the officers.

While the defendant claimed during the incident he did not know the trooper and local law enforcement were actual police officers, his actions suggest otherwise. When the trooper and deputy initially came to the door, the defendant placed AV1 as a human shield between the officers and himself. He hid the gun behind AV1's back and then discarded the firearm in the bathroom. If the defendant really believed the officers were imposters seeking violent retribution against him, then why did he disarm himself and hide the gun in the bathroom? If he truly believed his delusions, it would make more sense that he would remain armed to defend himself and his supposed loved ones. While the defendant was under the influence of ecstasy, his actions were not to the point of having no idea what was going on. He suffered from some paranoia, but

he knew those were real law enforcement officers, he knew he was a felon and tried to hide the fact he possessed a firearm.

This is not the defendant's first appearance in the criminal justice system, nor federal court. He is a Criminal History Category IV. He picked up federal drug trafficking charges and then a firearm offense while he was on federal pretrial release. While the defendant's work on pretrial release should be rewarded, the egregious facts and his significant criminal history warrant a lengthy prison sentence.

The Government's proposed advisory guideline range is fifty-seven to seventy-one months, factoring the recommended adjustments. While not bound by the Sentencing Guidelines, district courts must consult the guidelines and take them into account when sentencing. *United States v. Booker,* 543 U.S. 220, 125 S. Ct. 738, 767 (2005). The sentencing guidelines are advisory and one of the statutory factors this Court must consider when imposing a sentence. *See* 18 U.S.C. § 3553(a)(4); *United States v. Rita*, 551 U.S. 338, 347-48 (2007). The guideline serves as "the starting point and the initial benchmark" in every sentencing proceeding and "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Gall v. United States*, 552 U.S. 38, 49 (2007); *Rita*, 551 U.S. at 350. The guidelines serve as a "lodestone" at sentencing, and "cabin" or "anchor" a sentencing court's discretion. *Peugh v. United States*, 569 U.S. 530, 531 (2013). While advisory, the Supreme Court has observed that, "[c]ommon sense indicates that in general, this system will steer district courts to more within-guidelines sentences." *Id*.

/ / / /

/ / / /

**Conclusion**

Based on the foregoing, the Government recommends a fifty-seven-month sentence with three years of supervised release.

Dated: May 14, 2025.

Respectfully submitted,

WILLIAM M. NARUS
Acting United States Attorney

*/s/ Lewis S. Burkhart*
LEWIS S. BURKHART, OSB #082781
Assistant United States Attorney